UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| L.R. NELSON CORPORATION, ) | |
| ) | |
| Plaintiff, ) | No. 06-cv-1252 |
| ) | |
| v. ) | |
| ) | |
| GREAT AMERICAN INSURANCE ) | |
| COMPANY ) | |
| ) | |
| Defendant. ) | |

## O P I N I O N & O R D E R

Before the Court is Defendant Great American Insurance Company's Motion for Summary Judgment, filed on June 30, 2008. (Doc. 49) Plaintiff L.R. Nelson Corporation filed a response in opposition to the motion on July 24, 2008. (Doc. 54) And Great American filed a reply (Doc. 57) on August 14, 2008. Also before the Court are Nelson's motion to allow Great American to file certain summary judgment documents under seal (Doc. 43), filed on June 19, 2008, and Great American's motion for leave to file certain summary judgment documents under seal (Doc. 46), filed on June 26, 2008. For the reasons that follow, the motions to file under seal are both GRANTED, and the motion for summary judgment is DENIED.

### I.  BACKGROUND

The parties, Plaintiff L.R. Nelson Corporation and Defendant Great American Insurance Company, are involved in a dispute over insurance coverage. All of the material facts are undisputed. Great American was Nelson's excess

insurer for the period of March 1, 2000 to March 1, 2001. (Defendant's Statement of Undisputed Material Facts (Def.'s SMF) ¶ 15) In August 2001, Nelson, an Illinois based lawn and garden watering product manufacturer, was sued by Orbit Irrigation Products, Inc, a Utah based competitor, in the United States District Court for the District of Utah. In the Orbit Lawsuit, Orbit requested a declaration that a patent claimed by Nelson with respect to a certain hose nozzle (the "'117 Patent") was invalid. Additionally, Orbit sought to recover damages caused by Nelson's alleged disparagement of Orbit's products and alleged intentional interference with Orbit's business relationships. Nelson counter-claimed against Orbit for damages resulting from Orbit's alleged infringement of the '117 Patent.

In December 2002, Orbit submitted a filing to the district court in Utah, stating that it would present expert testimony at trial establishing that Nelson's allegedly illegitimate conduct had caused Orbit "millions of dollars of losses." (Def.'s SMF ¶ 7) The filing was served upon Nelson's counsel. Approximately a month later, on January 14, 2003, Orbit submitted an expert report estimating that Orbit's damages amounted to between ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Nelson's attorneys received this report no later than January 24, 2003. (Def.'s SMF ¶ 9) A supplemental expert report dated April 21, 2003 revised the damages estimate to as high ▇▇▇▇▇▇▇▇▇▇ for past and future loses.

At the time Nelson purportedly engaged in the conduct at issue in the Orbit Lawsuit, Nelson was insured under two successive primary insurance policies, issued by Reliance National Indemnity Company and Kemper Casualty Insurance

2

Company.  Each policy provided coverage for personal and advertising injuries up to a $1 million limit.  The primary policies also obligated the primary insurers to defend Nelson against certain types of lawsuits.  During that same period of time, Nelson was also insured under excess policies issued by Great American (the "Umbrella Policy") and Fireman's Fund Insurance Company.  Each excess policy provided $10 million in coverage for certain liabilities incurred by Nelson in excess of the limits of coverage provided by Nelson's primary insurance policies.[1]  (Def.'s SMF ¶¶ 14-18; Great American's policy attached as Ex. 15 to Doc. 48 )

Nelson notified Great American of the Orbit Lawsuit by a letter dated December 18, 2003.  (Def.'s SMF ¶ 19)  At all times prior to December 18, 2003, Nelson did not believe that the claims made by Orbit in the Orbit Lawsuit were likely to invoke the Great American excess policy.  (Plaintiff's Statement of Additional Facts (Ptf.'s SAF ¶ 1)  At the time Nelson notified Great American of the Orbit Lawsuit, Nelson was confident, as a result of assurances provided to Nelson by its attorneys, that Nelson's case against Orbit based on the '117 Patent was strong, that Orbit's claims were weak, and that the possibility of an adverse judgment was fairly remote.  (Ptf.'s SAF ¶ 1-2)

---

[1] In its complaint, Orbit sought recovery for alleged disparaging statements occurring "throughout 2000 and 2001."  (Def.'s SMF ¶ 7)  This allegation implicated the Reliance primary policy and the Great American excess policy, both effective from March 1, 2000 to March 1, 2001.  The allegation also implicated the Kemper primary policy and the Fireman's Fund excess policy, both effective from March 1, 2001 to March 1, 2002.

However, on March 19, 2004, Nelson suffered a significant blow in the Orbit Lawsuit. On that date, the district court in Utah entered an order invalidating the '117 Patent. (See Plaintiff's Response Brief at p.2) Despite this damaging ruling to Nelson, attorneys for Great American appeared confident that the Great American excess policy would not ultimately come into play. Peter Whalen, a partner with the firm that Great American had hired to represent it in association with the Orbit Lawsuit, stated to Nelson's counsel, in a letter dated September 27, 2004, that it appeared unlikely that Orbit's claims would ultimately involve the Great American excess policy. (Doc. 54, Ex. B) The letter stated that, in Mr. Whalen's opinion, even if the type of coverage included in the Great American policy was applicable, it was unlikely that Orbit's damages would exceed the $2 million in coverage that Nelson's primary insurers would supply.

Ultimately, in October 2005, Nelson paid Orbit approximately ▓▓▓▓▓▓ to settle the Orbit Lawsuit ("Orbit Settlement"). (Def.'s SMF ¶ 21-22) In July 2006, Nelson settled with Kemper on both primary policies in effect during Nelson's allegedly wrongful conduct.² Pursuant to the settlement agreement, Kemper paid Nelson ▓▓▓▓▓▓ in return for Nelson's agreement to generally release Kemper from liability in connection with the Orbit Lawsuit. (Def.'s SMF ¶ 27) In the settlement agreement, Nelson and Kemper did not designate any specific amount of the total settlement sum as payment for indemnity or as payment for the defense costs that Nelson incurred in the Orbit Lawsuit. (Def's SMF ¶ 28)

---

² Prior to Nelson's settlement with Kemper, Kemper acquired Reliance's rights and obligations under the Reliance primary policy.

On September 5, 2006, Nelson filed a complaint in Illinois circuit court, requesting a declaration that Great American and Fireman's Fund were jointly and severally obligated to indemnify Nelson for the sums in excess of underlying primary insurance limits that Nelson had become obligated to pay with respect to the Orbit Settlement. Great American and Fireman's Fund removed the case to federal district court on September 29, 2006. (Doc. 1) Great American answered Nelson's complaint and counterclaimed on October 18, 2006. (Doc. 8) On April 17, 2008, pursuant to a settlement agreement, Nelson stipulated to dismiss Fireman's Fund from the litigation. (Doc. 41) And on June 30, 2008, Great American filed a motion for summary judgment, which is now before this Court. (Doc. 49)

## II.   LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once the movant has met its burden, to survive summary judgment, the "nonmovant must show through specific evidence that a triable issue of fact remains

5

on issues on which [s]he bears the burden of proof at trial." Warsco v. Preferred Tech. Group, 258 F.3d 557, 563 (7th Cir. 2001); see also Celotex Corp., 477 U.S. at 322-24. "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." Chemsource, Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997).

This Court must nonetheless "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). In doing so, this Court is not "required to draw every conceivable inference from the record -- only those inferences that are reasonable." Bank Leumi Le-Isreal, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991). Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of material fact exists and, the moving party is entitled to judgment as a matter of law. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, in ruling on a motion for summary judgment, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

### III. ANALYSIS

As a preliminary matter, the Court grants the parties' motions to file certain summary judgment documents under seal. Both motions are unopposed, and the

relevant documents have been properly filed under seal, pursuant to the July 3, 2007 Stipulated Protective Order.

Great American argues that it is entitled to summary judgment on two grounds: (1) the Umbrella Policy does not provide coverage because Nelson failed to give Great American timely notice of the Orbit Lawsuit and (2) the Umbrella Policy does not provide coverage because Nelson failed to exhaust coverage available under its primary insurance policies. The parties agree that Illinois law governs this dispute.

### 1. Nelson's Notice to Great American of the Orbit Lawsuit

In its motion for summary judgment, Great American argues that Nelson's delay in notifying Great American of the Orbit Lawsuit was unreasonable. The Umbrella Policy provides as follows: "If a 'claim' or 'suit' against any 'Insured' is reasonably likely to involve this policy you must notify us in writing as soon as practicable." (Doc. 48, Ex. 15 § VI(F)(2))  Great American contends that by January 2003, Nelson had sufficient information from which to conclude that the Orbit Lawsuit was "reasonably likely" to involve the Great American Umbrella Policy.

In December 2002, Orbit stated in a court filing, served upon Nelson's counsel, that Orbit would present expert testimony at trial establishing that Nelson had caused Orbit "millions of dollars" of loses by disparaging Orbit's products and interfering with Orbit's business relationships throughout 2000 and 2001. Additionally, by January 24, 2003, Nelson's attorneys had received a report prepared by Orbit's damages expert, opining that the present value of Orbit's losses

7

was between ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  On December 18, 2003, Nelson notified Great American, in writing, of the Orbit Lawsuit.  Great American asserts that Nelson's notice was untimely.  According to Great American, after receiving Orbit's damages report—and perhaps earlier—Nelson was under a contractual duty to notify Great American that the Orbit Lawsuit was likely to invoke the Umbrella Policy.  Great American argues that because Nelson's notice of the Orbit Lawsuit was untimely, Great American has no duty to indemnify Nelson for Nelson's payment to Orbit in settlement of the dispute.

Nelson counters that its December 18, 2003 notice to Great American was not only timely, but early.  Nelson argues that until March 19, 2004, when the district court in the Orbit Lawsuit entered an order invalidating the '117 Patent, Nelson reasonably believed that the Orbit Lawsuit was unlikely to involve the Umbrella Policy.  According to Nelson, up until that date, Nelson believed, as a result of assurances by its attorneys, that its case against Orbit was strong.  Specifically, Nelson asserts that until the district court's March 19, 2004 order, Nelson was under the reasonable impression that the existence of the '117 Patent would ultimately lead the court to dismiss Orbit's claims.  Therefore, Nelson asserts, Great American was notified of the Orbit Lawsuit on December 18, 2003 early and only out of an abundance of caution.

In support of its argument of timely notice, Nelson points to a September 27, 2004 letter from Great American's counsel in the Orbit Lawsuit, stating that "it appears unlikely that the Orbit claim ultimately will involve the Great American

8

policies" and that "if there is any indemnity coverage under the Great American policies, at least $2 million in primary limits would be available to pay any covered damages, an amount that should be more than sufficient." (Doc. 54, Ex. B at p. 2) Nelson asserts that it is disingenuous of Great American to argue that Nelson had a duty to notify Great American of the Orbit Lawsuit in January 2003 when Great American's own counsel believed, as late as September 24, 2004, that damages in that lawsuit would not amount to enough to invoke the Umbrella Policy.

The key question, here, is at what point should Nelson have determined that the Umbrella Policy was likely to be invoked. Atlanta Int'l Ins. Co. v. Checker Taxi Co., Inc., 214 Ill. App.3d 440, 444 (1st Dist. 1991). The Court may decide the issue as a matter of law when, as here, the material facts are not in dispute. Keystone Consol. Indus, Inc. v. Employers Ins. Co. of Wausau, 470 F. Supp.2d 873, 882 (C.D. Ill. 2007).

Notice provisions in excess insurance policies are structured differently than notice provisions in primary policies. Id. at 886. Excess insurers are not interested in receiving notice of every claim or occurrence that could possibly invoke the policy. Rather, excess policies generally require the insured to notify the insurer of claims or occurrences that are "reasonably likely" to implicate the policy. As a result, the law is clear in Illinois that excess policies allow the insured more discretion than do primary policies when it comes to choosing the proper point in time to notify the insurer of a potential claim. American States Ins. Co., v. Nat'l Cycle, Inc., 260 Ill. App.3d 299, 311 (1st Dist. 1994). The relevant inquiry turns to whether the insured

9

abused its discretion in choosing when to notify the excess insurer. Keystone, 470 F. Supp.2d at 886.

In attempting to establish that Nelson was unreasonably late in notifying Great American of the Orbit Lawsuit, Great American cites to various cases where an insured's notice to an excess insurer was held to be unreasonable as a matter of law. Great American first cites to Montgomery Ward & Company, Inc. v. Home Insurance Co., 324 Ill. App.3d 441 (1st Dist. 2001) for the proposition that an insured's delay of eight to twelve months in notifying its excess insurer of an occurrence likely to implicate the policy constitutes a breach of the policy. But Montgomery is readily distinguishable from the instant case. In Montgomery, the court charged the insured with the duty to notify its excess insurer of a potential environmental claim only after insured had already been declared by the United States Environmental Agency to be a Potentially Responsible Party in connection with a Superfund site. Additionally, the insured was charged with the duty to notify only after it had agreed to cooperate with the EPA, participated in steering committee activities aimed at remedying contamination at the site, and only after the insured had learned that the estimated remediation cost was well over the limits of its self-provided primary insurance policies. See Montgomery, 324 Ill. App.3d at 445-46. Despite the practical certainty that it would be liable and that its liability would exceed the limits of its self-insured retentions, the insured waited nearly a year to notify its excess insurer.

By contrast, in January 24, 2003, the date Great American argues that Nelson's duty to notify arose, Nelson was far from practically certain that it would incur any liability to Orbit.  It is undisputed that Nelson believed, on January 24, 2003, that it would not incur liability in the Orbit Lawsuit.  And Great American has presented no evidence showing that Nelson's belief was unreasonable.  In fact, it is undisputed that Nelson's belief as to ultimate success in the Obit suit was based on the presumably objective advice from its outside counsel.

The other cases to which Great American cites offer no more support than Montgomery.  The court's holding in National Cycle, favoring an insurer, was based on the significant prejudice to the insurer caused by the insured's untimely notice of a claim.  In the present case, Great American does not even argue that it was prejudiced by the timing of Nelson's notice.  Moreover, it would be difficult for Great American to make a prejudice argument in light of Mr. Whalen's letter of September 27, 2004, indicating that months after it was notified, Great American was still not too concerned with the Orbit claims.  Great American also cites to General Casualty Company of Illinois v. Juhl, 283 Ill. App.3d 376 (4th Dist. 1996), where an insurer was granted summary judgment as a result of an insured's late notice of a potential claim.  But the policy in that case required "prompt" notice instead of the instant Umbrella Policy's requirement of notice "as soon as practicable."  The Court in Juhl held that there is a significant difference between the two phrases.  Juhl, 283 Ill. App.3d at 381.

Nelson makes a more compelling argument. Nelson relies primarily on <u>Hartford Accident and Indemnity Co. v. Rush-Presbyterian-St. Luke's Medical Center</u>, 231 Ill. App.3d 143 (1st Dist. 1992). In that case, an insured hospital, covered by a $1 million primary policy, waited twenty months after being served with a complaint alleging malpractice, and seven months after receiving a settlement demand of $10 million, to notify its excess insurer of the suit. <u>Hartford</u>, 231 Ill. App.3d at 146. The court held that the insured hospital did not breach the excess policy's notice provision, reasoning that the hospital could reasonably have viewed the settlement offer as mere posturing. The court went on to clarify the governing standard, pointing out that the key word in the notice provision was "likely." The word "likely," held the court, is materially different than the word "possible." <u>Id.</u> at 152; <u>see also</u> <u>Atlanta</u>, 214 Ill. App.3d at 446. Lastly, the <u>Hartford</u> court noted that the insurer was not prejudiced by the insured's allegedly untimely notice.[3]

This Court finds the facts in <u>Hartford</u> analogous to the case at bar. The Court is unable to say, as a matter of law, that Nelson acted unreasonably in waiting until the '117 Patent was nullified to notify Great American of the Orbit Lawsuit. Although Nelson was privy to a report by Orbit's damages expert, which pegged estimated damages over the amounts that would be covered by the Kemper

---

[3] Great American points out that the Court need not find that it was prejudiced by the delay in Nelson's notice of the Orbit Lawsuit in order to find the delay unreasonable. While Great American is correct on this point, Nelson is also correct in pointing out that prejudice remains a significant factor in determining the reasonableness of a delay in notification. <u>Country Mut. Ins. Co. v. Livorsi Marine, Inc.</u>, 222 Ill.2d 303, 317 (2006).

12

and Reliance primary insurance policies, Nelson's prediction that it would win the Orbit Lawsuit and incur no damages does not seem to have been an unreasonable one.  Further, it is significant and worth repeating that Great American has not even attempted to establish that it was prejudiced by the delay in notice.

### 2.  Exhaustion of Primary Coverage

Great American asserts that it has no duty to indemnify Nelson as to the Orbit settlement because Nelson failed to exhaust the coverage of its primary insurance policies.  Under Illinois law, all applicable primary insurance policies covering the relevant risk must be exhausted before excess insurance is invoked. Kajima Constr. Servs, Inc. v. St. Paul Fire & Marine Ins. Co., 368 Ill. App3d 665, 670 (1st Dist. 2006).  Great American sets out a complex argument.  It contends that because Kemper's settlement payment to Nelson exceeded the indemnity limits for the Kemper and Reliance primary policies, the settlement must have included payment by Kemper for Nelson's defense costs.  Great American goes on to argue that it was Nelson's burden to structure its settlement agreement with Kemper so as to expressly allocate the payment between indemnity and defense costs.  Because the settlement agreement with Kemper made no such express allocation, Great American asks the Court to find that Nelson settled for an indemnity payment that was less than the applicable limits on the primary policies at issue.[4]

---

[4] According to Great American, it is implicit in the Kemper-Nelson settlement agreement that ▓▓▓▓▓ of the total amount Kemper paid to Nelson should be deducted from the amount applied toward the underlying indemnity limits of the primary policies.  Great American infers that Kemper paid ▓▓▓▓▓ to Nelson in reimbursement for post-tender defense costs.  Using this reasoning, Great American

13

What Great American attempts to do is to cast this case in the mold of <u>United States Fire Insurance Co. v. Lay</u>, 577 F.2d 421 (7th Cir. 1978). That case held that an excess insurer is not obligated to provide coverage when an insured settles with its primary insurer for less than the coverage limit on the primary policy. The distinguishing and determinative fact in this case, however, is that Nelson did not settle with Kemper for less than the combined indemnity limits of the primary policies. To the contrary, Kemper paid Nelson in excess of those limits. Not left with much to stand on, Great American invites the Court to look beyond the face of the Kemper settlement agreement and decipher the parties' intent with respect to an allocation between payment for indemnity and payment for defense costs. The Court rejects the invitation to engage in guesswork. It is true that the Nelson did not expressly allocate, in the settlement agreement with Kemper, a portion of the settlement payment to indemnity. But Great American has failed to point to, and this Court has not identified, an Illinois decision where that fact alone excused an excess insurer from providing coverage under circumstances similar to those at bar. Great American's argument, then, is novel but unsupported. Accordingly, this Court cannot say, as a matter of law, that Nelson failed to properly exhaust its primary policies.

---

argues that Nelson settled with Kemper for an indemnity payment of approximately ▓▓▓▓▓▓▓▓, an amount less than the combined applicable limits of the two primary policies. (<u>See</u> Def.'s SJ Mem at p. 19-20) Therefore, argues Great American, Nelson failed to exhaust its $2 million in primary coverage.

## IV.    CONCLUSION

For the reasons stated above, the parties' motions to file certain summary judgment documents under seal (Docs. 43, 46) are GRANTED and Great American's Motion for Summary Judgment (Doc. 49) is DENIED.  Because it appears that the material facts are not in dispute, the Court would invite Nelson to file a motion for summary judgment with respect to the two issues considered in this opinion.

Additionally, the Final Pretrial Conference is rescheduled for April 24, 2009 at 2 p.m.  The parties will meet with Judge McDade's Law Clerk at 1 p.m. on that date.  Further, the Trial is rescheduled for May 18, 2009 at 9 a.m.

This opinion has been redacted because it contains information subject to a stipulated protective order in this case.  An unredacted version has been filed under seal.

ENTERED this 22nd day of September, 2008.

s/ Joe B. McDade<br>Joe Billy McDade<br>United States District Judge